UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LEEANN ZETTL                          :
                                      :
          v.                          :        C.A. No. 06-471S
                                      :
MICHAEL J. ASTRUE                     :
Commissioner of Social Security       :


## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge


This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"), 42 U.S.C. § 405(g). Plaintiff filed her Complaint on October 25, 2006 seeking to reverse the decision of the Commissioner. On March 30, 2007, Plaintiff filed a Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision. (Document No. 4). On April 27, 2007, the Commissioner filed a Motion for an Order Affirming the Decision of the Commissioner. (Document No. 6).

This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72. Based upon my review of the record and the legal memoranda filed by the parties, I find that there is substantial evidence in this record to support the Commissioner's decision and findings that the Plaintiff is not disabled within the meaning of the Act. Consequently, I recommend that the Commissioner's Motion for an Order Confirming the Decision of the Commissioner (Document No. 6) be GRANTED and that the Plaintiff's Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision be DENIED. (Document No. 4).

## I.      PROCEDURAL HISTORY

Plaintiff filed an application for DIB on March 29, 2004, alleging disability as of February 11, 2004.  (Tr. 116-119).   The applications were denied initially (Tr. 98, 100-103) and on reconsideration.  (Tr. 99, 106-109).  Plaintiff requested an administrative hearing.  (Tr. 110).  On October 3, 2005, Administrative Law Judge Martha Bower ("ALJ") held a hearing at which Plaintiff, represented by counsel, a vocational expert ("VE") and a medical expert ("ME") appeared and testified.  (Tr. 37-97).  The ALJ issued a decision on October 21, 2005 finding that Plaintiff was not disabled.  (Tr. 21-32).  The Appeals Council denied Plaintiff's request for review on July 28, 2006, making the ALJ's decision the final decision of the Commission.  (Tr. 11-12).  A timely appeal was then filed with this Court.

## II.      THE PARTIES' POSITIONS

Plaintiff argues that (1) the ALJ erred by failing to find Plaintiff's fibromyalgia was a severe impairment; (2) her non-exertional limitations are more severe than the ALJ's finding; (3) the ALJ failed to appropriately apply the treating physician rule; (4) the Appeals Council erred in refusing to remand based upon submitted evidence; and (5) substantial evidence does not support the ALJ's decision.

The Commissioner disputes Plaintiff's claims and argues that there is substantial evidence in the record to support the ALJ's RFC assessment.  The Commissioner also argues that the Appeals Council correctly denied review of the ALJ's decision.

## III.      THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law.  Nguyen v. Chater, 172 F.3d  31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  Seavey, 276

F.3d at 8.  To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow her to explain the basis for her decision.  Freeman v. Barnhart, 274 F.3d 606, 609-610 (1st Cir. 2001).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Jackson v. Chater, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Id. With a sentence six remand, the parties must return to the court after remand to file modified findings of fact. Id. The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A.   Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments, is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(e). See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

## B.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.   Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained.  See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987).  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  Id.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C.      Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

### D.      The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or

combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(i)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Id.

### E.      Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Seavey, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at 5. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36. In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Heggarty, 947 F.2d at 996. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1.    Pain

"Pain can constitute a significant non-exertional impairment."  Nguyen, 172 F.3d at 36.

Congress has determined that a claimant will not be considered disabled unless he furnishes medical

and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42

U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms,

including pain, and determine the extent to which the symptoms can reasonably be accepted as

consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the

medical signs and laboratory findings show medical impairments which reasonably could be

expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis

and consider the following factors:

(1)    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2)    Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3)    Type, dosage, effectiveness, and adverse side-effects of any pain medication;

(4)    Treatment, other than medication, for relief of pain;

(5)    Functional restrictions; and

(6)    The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1ˢᵗ Cir. 1986).  An individual's

statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### 2.    Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Rohrberg, 26 F. Supp. 2d at 309.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V.    APPLICATION AND ANALYSIS

Plaintiff was fifty-two years old on the date of the ALJ's decision.  (Tr. 116).  Plaintiff has a college education (Tr. 139), and worked for many years as a computer programmer in the manufacturing, healthcare and banking industries and more recently as a fast-food cook for several months.  (Tr. 85, 133-134).  Plaintiff alleged disability due to pain in her hands, back and neck, migraine headaches and depression.  (Tr. 40-43, 132, 164).

Plaintiff began treating with Dr. Kristen DiMarco in May 2000, at which time she complained of depression and increased stress, for which she was prescribed Zoloft (Tr. 263-264), which improved her symptoms.  (Tr. 241, 246, 261).  On August 28, 2000, Dr. DiMarco saw

Plaintiff for complaints of pain in her neck and at the base of her skull (Tr. 255), and an MRI of the cervical spine showed degenerative disc disease with significant foraminal encroachment at the C5-C6 level. (Tr. 256). Dr. DiMarco prescribed Indocin, Flexeril and physical therapy. (Tr. 254). In October 2000, Dr. DeMarco reported that Plaintiff's cervical stenosis was stable and improving. (Tr. 251-252). Plaintiff complained of bilateral hand paresthesias and reduced grip strength, and Dr. DiMarco found grip strength of 5/5, a positive Tinel's sign and negative Phalen's sign. (Tr. 251). She assessed bilateral carpal tunnel syndrome and prescribed wrist splints and Naproxin. Id.

In January 2001, Plaintiff reported no weakness, strength loss, pain or paresthesias, and Dr. DiMarco felt her carpal tunnel syndrome was "resolving." (Tr. 249). On August 24, 2001, Dr. DiMarco saw Plaintiff for complaints of recurrent neck pain, and she referred Plaintiff for physical therapy and increased her Indocin and prescribed Flexeril. (Tr. 244). A December 2001 MRI of the cervical spine showed spondylotic changes primarily at C5-C6 but no evidence of focal disc hernia or central stenosis. (Tr. 243). By March 2002, Plaintiff reported improvement to her neck condition and that physical therapy was helping; and Dr. DiMarco felt she was "stable" and "doing well." (Tr. 240).

Plaintiff again saw Dr. DiMarco for complaints of neck pain and carpal tunnel syndrome symptoms in January 2004, at which time she reported that she had started a new job at McDonald's. (Tr. 216). On January 8, 2004, Dr. Gary L'Europa performed an EMG and nerve conduction studies which were consistent with bilateral carpal tunnel syndrome. (Tr. 184, 186). In February 2004, Plaintiff complained of pain in her neck, arms and hands secondary to her job and that her medication was not helping. (Tr. 205). Plaintiff indicated that she may seek permanent disability, and Dr. DiMarco opined, "[s]he is not permanently disabled at present." (Tr. 205). (emphasis in

original).  On March 4, 2004, Dr. L'Europa saw Plaintiff for bilateral upper extremity pain, which she described as a constant ache of moderate severity aggravated by activity.  (Tr. 180).  Dr. L'Europa reported a normal physical exam and prescribed wrist splints, Celebrex and physical therapy for Plaintiff's carpal tunnel syndrome.  (Tr. 181).

In a March 24, 2004 letter to Dr. DiMarco, Neurosurgeon Dr. Sumit Das stated that he saw Plaintiff for complaints of bilateral hand pain, back pain and leg pain and that his physical exam of Plaintiff was unremarkable.  (Tr. 200).  He reported that Plaintiff "grossly exhibits very minimal effort during the examination. Even palpation with the reflexes causes pain in all extremities." (Tr. 200).  He reported that an MRI showed degenerative changes at C5-C6 with some foraminal narrowing.  (Tr. 195, 201).  He kept Plaintiff out of work for a week but felt Plaintiff "most likely can return to light duty." (Tr. 201).  In an April 5, 2004 letter to Dr. DiMarco, Dr. Das reported that a lumbar spine MRI showed a small disc herniation at L4-L5 with an annular tear, which he felt explained Plaintiff's right leg radicular symptoms.  (Tr. 197, 346).  He recommended an epidural steroid injection and stated, "I sincerely believe she can go back to light duty and she is not a candidate for disability." (Tr. 197).  On that same date, Plaintiff applied for disability insurance benefits, alleging disability as of February 11, 2004.  (Tr. 116-119).

On May 19, 2004, Plaintiff again told Dr. DiMarco she wanted to receive disability benefits, this time due to pain and an inability to walk, and she requested a wheelchair and a handicapped license plate.  (Tr. 202).  Dr. DiMarco reported that Plaintiff walked down the hallway and into the examination room without difficulty and that her physical exam was within normal limits.  Id.  Dr. DiMarco also reported that she spoke to Dr. Das, who stated that Plaintiff's exam and an MRI were unremarkable and that he felt there was no medical reason for Plaintiff to need a wheelchair or

handicapped license plate and that Plaintiff could work.  Id.  Dr. DiMarco reiterated, "Both Dr. Das and I feel [Plaintiff] does not want to work but is capable of working."  Id.  She declined to complete forms for Plaintiff to obtain a handicapped license plate or a wheelchair and advised Plaintiff to see a pain specialist.  Id.

In a May 19, 2004 letter to Dr. DiMarco, Dr. Das reported that he saw Plaintiff in follow-up and that neurologically, she was completely intact and was ambulating without difficulty. (Tr. 196). He stated that Plaintiff reported an inability to walk long distances, and while he gave her a prescription for a wheelchair, he again opined that she could do light work and that he did not believe she required a handicapped license plate or that she was a surgical candidate.  Id.

On May 28, 2004, Dr. Laila Akhund saw Plaintiff, who had left Dr. DiMarco's practice and reported multiple complaints including neck pain of ten years duration, hand numbness and tingling that had recently improved, headaches radiating from her neck, back pain and an inability to walk long distances.  (Tr. 282).  On exam, Plaintiff's head and neck were normal and she had a mildly positive Phalen's test, a negative Tinel's sign and no objective evidence of lower extremity weakness.  (Tr. 283).  Dr. Akhund referred Plaintiff to Dr. Iqbal.  Id.

On July 6, 2004, DDS Physician Dr. Youssef Georgy reviewed the record available at that time, (Tr. 100) and opined that Plaintiff had exertional capacities consistent with the performance of light work, could occasionally perform various postural movements and needed to "avoid frequent repetitive hands motion."  (Tr. 268-270).

In a July 6, 2004 letter to Dr. Akhund, Neurologist Dr. Arshad Iqbal stated that he saw Plaintiff for multiple neurological complaints and found increased motor tone in the lower extremities of unclear origin and a positive Tinel's sign and negative Phalen's sign.  (Tr. 290-291).

-14-

He opined that Plaintiff most likely had chronic carpal tunnel syndrome and migraine headaches possibly due to cervical spondylosis.  (Tr. 291).  He performed an EMG and nerve conduction studies that were consistent with mild compression of the right medial nerve at the wrist, with no evidence of cervical radiculopathy.  (Tr. 289).  On August 3, 2004, Dr. Iqbal opined that Plaintiff had only mild carpal tunnel syndrome on the right and no evidence of carpal tunnel syndrome on the left.  (Tr. 287).  He felt Plaintiff's wrist pain was most likely musculoskeletal and that there was no evidence of cervical radiculopathy or radiculopathic compression.  Id.  He prescribed Topomax to prevent Plaintiff's migraines and Relpax to abort, and recommended physical therapy, which Plaintiff found helpful.  (Tr. 287).

On August 4, 2004, Dr. Akhund saw Plaintiff for complaints of continued pain, increased stress and depression, and she prescribed Zoloft for her depression, Celebrex for her osteoarthritis and Relpax for migraines.  (Tr. 279).  On August 23, 2004, Dr. Akhund reported that Plaintiff had recently returned from vacation and complained of "pain all over" especially in the lower back and left leg.  (Tr. 275).  Plaintiff did not have evidence of significant carpal tunnel syndrome or cervical spondylosis, and she exhibited limited range of motion and normal reflexes and muscle power.  Id. Dr. Akhund assessed chronic pain syndrome, possibly due to osteoarthritis or fibromyalgia.  Id.

On August 26, 2004, Rheumatologist Dr. Iulia Grillo saw Plaintiff for complaints of right knee pain and back pain.  (Tr. 299).  Plaintiff stated that she usually used a wheelchair, though she did not have one when she went on vacation recently, and she alleged increased symptoms when she tried to walk.  Id.  On exam Plaintiff had puffy hands and fingers, tenderness at the shoulders, multiple tender points and a positive Tinel's sign on the right.  (Tr. 300).  Dr. Grillo felt Plaintiff's symptoms suggested fibromyalgia, though she wanted to rule out any inflammatory disease or other

causes. (Tr. 301). On September 9, 2004, Dr. Grillo saw Plaintiff on follow-up and recommended that she continue with physical therapy for her spondylosis, which was helpful, and that she take Flexeril on a regular basis. (Tr. 295). An MRI of the left hand and wrist showed no abnormality within the area of reported pain. (Tr. 294).

On September 14, 2004, Plaintiff reported to her physical therapist that she "did a lot of walking on a hilly golf course" the previous Saturday and was sore. (Tr. 309). In a September 16, 2004 letter to Dr. Akhund, Dr. Iqbal reported that Plaintiff's migraines had significantly decreased with Topomax, that physical therapy and a Licoderm patch were helpful in relieving her back pain and that her carpal tunnel syndrome was stable. (Tr. 286). On October 4, 2004, Dr. Grillo saw Plaintiff and assessed inflammatory arthritis and possible fibromyalgia. (Tr. 293).

On November 4, 2004, Psychiatrist Stephen Dizio performed a consultative examination of Plaintiff, who complained of chronic pain and depression. (Tr. 316). He assessed major depression, recurrent, currently in partial remission in response to medication, and he felt Plaintiff would benefit from a higher dose of medication. (Tr. 319). He noted that Plaintiff described herself as "primarily limited by her physical problems." Id. He felt Plaintiff's ability to make occupational adjustments, carry out instructions and respond to work pressures would be moderately limited, as would her personal and social adjustments and daily activities. Id.

On October 20, 2004, Dr. Akhund saw Plaintiff, who reported that she was "coping fairly well with the pain" and was using Celebrex and a muscle relaxant. (Tr. 389). Her depression was better on Zoloft, and her headaches were well controlled on Topomax, occurring every other month. Id. Dr. Akhund opined that Plaintiff's chronic pain syndrome was "well controlled" and that she was "coping with the pain much better." Id.

On November 16, 2004, Psychologist J. Stephen Clifford reviewed the record available at that time (Tr. 106) and opined that Plaintiff had moderate difficulties maintaining concentration, persistence or pace, and one or two episodes of decompensation. (Tr. 330). He further opined that Plaintiff had moderate work-related limitations relative to sustained concentration and persistence, (Tr. 334-335), but that she retained the functional capacity to understand and remember simple and complex procedures and could perform simple assignments of a few, quick and recurring steps. (Tr. 336).

Dr. John Bernardo also reviewed the available record in November 2004, and he opined that Plaintiff had exertional capacities for light-work activity with limited pushing/pulling with the upper extremities. (Tr. 339). He further opined that Plaintiff could frequently balance and stoop, could occasionally kneel, crouch and climb ramps/stairs, could never crawl or climb ladders/ropes/scaffolds, needed to avoid overhead reaching, overhead lifting, keyboarding, and repetitive pinching, squeezing and grasping and was restricted from concentrated exposure to temperature extremes, noise, vibration, respiratory irritants and hazards. (Tr. 340-342).

On February 1, 2005, Plaintiff reported to Dr. Akhund that Celebrex and a muscle relaxant were providing fair to good pain relief, though she had difficulty with cooking and walking long distances. (Tr. 391). On May 3, 2005, Dr. Akhund saw Plaintiff and reported that she was dealing with her pain much better, was trying to walk fifteen minutes a day and had "intentionally" lost weight. (Tr. 392). Dr. Akhund felt Plaintiff's chronic pain syndrome was "well controlled." Id.

In a May 24, 2005 letter to Dr. Akhund, Dr. Iqbal reported that Plaintiff's migraines were well controlled with medication, occurring just once a week and responding rapidly to a dose of Relpax. (Tr. 361). He further reported that Plaintiff had an independent and steady gait. He

recommended that Plaintiff lower her dosage of Neurontin to reduce her complaints of fatigue.  Id.
A July 19, 2005 bilateral hand x-ray was negative.  (Tr. 395).

In an August 26, 2005 letter to Dr. Akhund, Dr. Keith Rafal reported that he evaluated
Plaintiff for a diagnosis of fibromyalgia.  (Tr. 362).  Plaintiff reported a fifteen-year history of
generalized muscle and body aches, in addition to carpal tunnel syndrome, cervical disc disease,
lumbar disc disease, headaches every two weeks or less and depression and anxiety which improved
with Zoloft.  Id.  All of her medication was helpful to her, and she had never been on any narcotic
pain medication.  (Tr. 363).  On exam, she had positive tender points, some decreased grip strength
and decreased range of motion in the left shoulder, cervical spine and hips.  Id.  Dr. Rafal felt
Plaintiff met the diagnostic criteria for fibromyalgia, but noted that she had an elevated
sedimentation rate (Tr. 369, 371) and recommended that other rheumatic conditions be ruled out.
(Tr. 363).  A September 7, 2005 occupational therapy evaluation indicated that Plaintiff cared for
dogs, read and walked for leisure.  (Tr. 380).

In a September 22, 2005 questionnaire, Dr. Akhund opined that Plaintiff was limited to
lifting/carrying less than ten pounds; could sit, stand and walk for about six hours each in an eight-
hour day and had limited push/pull capacities in the upper and lower extremities.  (Tr. 396-397).
Dr. Akhund further opined that Plaintiff could frequently climb and could occasionally perform
other postural movements, could frequently handle and finger and occasionally reach and feel, and
that she had various environmental limitations.  (Tr. 397-399).  She also opined that Plaintiff's pain
would interfere with concentration on job tasks.  (Tr. 400).

Plaintiff testified that she was disabled because she could not use her hands due to pain.  (Tr.
41, 44).  She stated that she also had pain in her neck, though it was controlled with physical

therapy, as well as pain in her right leg and her spine.  (Tr. 41).  She also had migraines and suffered from depression.  (Tr. 43-44).  She testified that medication did not help her hand pain, though it did help her back pain somewhat.  (Tr. 47, 49).  She testified that she had a migraine about once a week and that Topomax "cut them down somewhat" but did not totally get rid of them.  (Tr. 54).  She stated that Zoloft helped "a bit" with her depression.  (Tr. 55).  She stated that Dr. Akhund "very strongly" recommended counseling, but that Plaintiff did not think it would help.  (Tr. 55-56).  Plaintiff stated that she worked at McDonald's for a few months but had to leave due to pain.  (Tr. 42, 59-60).  Before that job, she worked as a computer programmer at Fleet Bank until she was laid off when Fleet merged with another bank.  (Tr. 42, 57-58).  She stated that she was not able to keep up with her job at the bank due to her pain.  (Tr. 43, 58).  She also stated that she was unable to keep her job after the bank merger because she knew Cobol programming but did not know the new programming languages.  (Tr. 58).  She said that she was laid off due to a combination of her medical condition and her inability to adapt to the new workplace.  Id.

Plaintiff testified that she had difficulty washing her hair and preparing meals and that she did not do housework.  (Tr. 51-52).  She testified that she drove occasionally, watched television for one to two hours a day and read.  (Tr. 52).  She stated that she played board games with her daughter but that her daughter had to move the game pieces for her.  (Tr. 54-55).  She testified that she went on vacation to Pennsylvania for a week during the previous summer, slept in a trailer and took her daughter to an amusement park.  (Tr. 53-54).  She stated that she used a motorized wheelchair at the amusement park because she could not handle the walking.  (Tr. 54).  When the ALJ noted that Plaintiff told Dr. Grillo she did not use a wheelchair on vacation (Tr. 299), Plaintiff insisted that she

told Dr. Grillo she had used one.  (Tr. 54).  While on vacation, Plaintiff also took her daughter shopping, though she stated that she was in a wheelchair.  Id.

Dr. Stephen Kaplan, the ME, reviewed Plaintiff's entire record.  (Tr. 65).  He testified that Plaintiff would not qualify for a diagnosis of fibromyalgia because of her elevated sedimentation rate.  (Tr. 69-70, 81-82) and that hand pain is not usually a problem in fibromyalgia.  (Tr. 69-70).  He further testified that Plaintiff would not have swollen hands and an elevated sedimentation rate if she had fibromyalgia.  (Tr. 83).  He testified that hand x-rays do not show inflammatory arthritis of the hands or inflammatory osteoarthritis of the fingers.  (Tr. 82).  He opined that Plaintiff's depression could be "playing a major role here in terms of her perception of disability."  (Tr. 72).  He further opined that Plaintiff "doesn't meet any of our standards in disability evaluation."  Id.

Dr. Kaplan opined that "based strictly on the objective data there is not much I can point to, except she has been observed to have some puffy hands."  (Tr. 73).  He opined that based on the puffy hands and the possibility of carpal tunnel syndrome, Plaintiff would be limited from having to grip things very tightly.  Id.  He opined that "there really isn't anything objective with respect to the back or the neck" and that there was no clinical correlation to Plaintiff's small cervical disc herniation or the minimal disc bulging in her lumbar spine.  (Tr. 73-74).  He testified that Plaintiff's complaints of diffuse pain and tender points are not the same as a nerve compression type of complaint (Tr. 74), and he testified that this interpretation was the same as that of Dr. Das.  Id.  He testified that in prescribing a wheelchair for Plaintiff, Dr. Das was responding to a subjective complaint and that "he clearly felt there was no neurosurgical problem."  (Tr. 76).  He testified that with respect to the August 2000 MRI evidence showing significant foraminal encroachment at the C4-C5 level, there were no corresponding complaints of radiculopathy, so that "in terms of

subjective complaints and objective testing there's nothing to correlate with the foraminal encroachment." (Tr. 76-77).  He opined that based on his review of the record, Plaintiff had chronic pain of undetermined origin and that psychiatric help may be valuable.  (Tr. 84).  Dr. Kaplan opined that with respect to side-effects from Plaintiff's medications, such as drowsiness, Plaintiff was on "fairly conservative" medications and was not on narcotic pain medication on a regular basis.  (Tr. 75).

The VE testified that Plaintiff's past work was that of a fast-food worker (unskilled, medium exertion) and computer programmer (skilled, medium exertion as performed, otherwise sedentary exertion).  (Tr. 85).  The VE was asked to assume an individual of Plaintiff's age, education and work background who was limited to light work with no repetitive, forceful grasping or gripping of the fingers, no exposure to unprotected heights or dangerous equipment, no repetitive stooping, kneeling, crouching crawling or bending, and no climbing of ropes or ladders, and no more than simple, one, two or three-step tasks.  (Tr. 86-87).  The VE testified that such an individual could perform the following representative unskilled jobs: retail work (approximately 3,600 positions regionally), counter clerk (approximately 1,200 positions regionally), general office clerk (approximately 3,100 positions regionally) and light messenger delivery worker (approximately 1,800 positions regionally).  (Tr. 86-87, 90).

The VE was also asked to assume that the individual was limited to light work with no repetitive crouching, crawling, stooping or kneeling; no repetitive climbing of ropes, ladders or scaffolds; no unprotected heights or dangerous equipment; no repetitive forceful grasping or gripping with the hands; no repetitive overhead reaching or lifting with the hands; no concentrated exposure to extremes of temperatures, noise, vibration or pulmonary irritants and no more than

simple one-, two- or three-step tasks.  (Tr. 93-94).  In response, the VE testified that all of the unskilled work previously identified would be available.  (Tr. 94).

The ALJ decided this case adverse to Plaintiff at Step 5.  At Steps 2 and 3, the ALJ found that Plaintiff had severe impairments of bilateral carpal tunnel syndrome, cervical and lumbar disc disease and major depression, but that she had no impairment(s) of listing-level severity.  (Tr. 26-27, 30 at Findings 3-4).  The ALJ found that Plaintiff retained the RFC to perform light work involving simple, one- to three-step instructions and with no repetitive forceful gripping or grasping; no repetitive bending, crawling, crouching, stooping, kneeling; no climbing of ropes, ladders or scaffolds; no working at unprotected heights or with dangerous equipment; no repetitive overhead reaching or lifting; and no concentrated exposure to extremes of noise, temperature or vibration. (Tr 28, 31 at Finding 6).  At Step 4, the ALJ found that Plaintiff could not perform her past relevant work.  (Tr. 29, 31 at Finding 7), but at Step 5, she found that Plaintiff could perform other work which existed in significant numbers in the national economy.  (Tr. 30, 31 at Finding 12). Accordingly, the ALJ concluded that Plaintiff was not disabled.  (Tr. 30-31).

## A.    Plaintiff Has Not Presented a Reviewable Appeals Council Decision

Plaintiff contends that the Appeals Council erred in refusing to remand based upon the additional evidence she submitted after the ALJ's decision.  Although Plaintiff was represented by counsel at the ALJ hearing, it appears that she was not represented by counsel when she sought Appeals Council review.  (Tr. 17-19).  Plaintiff twice sought additional time to present additional evidence to the Appeals Council.  (Tr. 15-16, 402-403).  By letter dated January 12, 2006, Plaintiff's husband indicated to the Appeals Council that "[t]he earliest possible time that I could get

everything together would be late April early May, if there is any chance that I receive the reports sooner I will send them along." (Tr. 403).

On April 28, 2006, the Appeals Council denied Plaintiff's request for review. (Tr. 5-7). The Appeals Council made a mistake in its decision. It advised Plaintiff that "we have adjudicated the case at the end of May 2006 at which time no additional evidence was received." (Tr. 6). However, the Appeals Council actually adjudicated the case at the end of April and just before Plaintiff's husband's submission. By letter dated May 1, 2006, Plaintiff's husband submitted a short letter dated March 2, 2006 from Dr. Keith Rafal, a treating physician. (Tr. 13-14).

The Appeals Council corrected its error. It acknowledged receipt of Dr. Rafal's March 2, 2006 letter and considered its contents. (Tr. 11). Thus, its error in jumping the gun and prematurely ruling on Plaintiff's request for review was harmless.

The next question is whether the Appeals Council's subsequent July 28, 2006 decision to deny review is reversible error. Generally, the discretionary decision of the Appeals Council to deny a request for review of an ALJ's decision is not reviewable. A judicial review under 42 U.S.C. § 405(g) is typically focused on the findings and reasoning of the ALJ, i.e., whether the ALJ's findings are supported by substantial evidence and whether the ALJ has properly applied the law. Of course, it makes no sense from an efficiency standpoint for a reviewing court to spend time and resources critiquing the work of the Appeals Council when it has jurisdiction to review the underlying and operative ALJ decision. In other words, reversible error by an ALJ can be remedied by the Court regardless of what the Appeals Council did or did not do.

The First Circuit has, however, held that review of Appeals Council action may be appropriate in those cases "where new evidence is tendered after the ALJ decision." Mills v. Apfel,

244 F.3d 1, 5 (1st Cir. 2001).  In such cases, "an Appeals Council refusal to review the ALJ may be reviewable where it gives an egregiously mistaken ground for this action."  Id.  This avenue of review has been described as "exceedingly narrow." Harrison v. Barnhart, C.A. No. 06-30005-KPN, 2006 WL 3898287 (D. Mass. Dec. 22, 2006).  Further, the term "egregious" has been interpreted to mean "[e]xtremely or remarkably bad; flagrant," Ortiz Rosado v. Barnhart, 340 F. Supp. 2d 63, 67 (D. Mass. 2004) (quoting Black's Law Dictionary (7th ed. 1999)).

In this case, the ALJ hearing took place on October 3, 2005, and the ALJ issued her decision on October 21, 2005.  On May 1, 2006, Plaintiff presented a March 2, 2006 letter from Dr. Rafal to the Appeals Council.  Dr. Rafal's letter states that Plaintiff is his patient, was initially evaluated on August 26, 2005 and has a "diagnosis of fibromyalgia" and "remains symptomatic." (Tr. 14).  Dr. Rafal also observes that it is "not uncommon for patients to experience  generalized muscle and soft tissue pain that could include the hands and distal extremities."  Id.  At that time, Plaintiff provided no other medical records or testing results from Dr. Rafal, and Dr. Rafal's letter offers no information regarding the limitations associated with Plaintiff's diagnosis.  In its second denial of review, the Appeal Council noted the existence of Dr. Rafal's diagnosis but concluded that it "does not in [and] of itself support a conclusion that you are disabled."  (Tr. 11).

Based on the limited contents of Dr. Rafal's letter, this Court sees no basis for concluding that the Appeals Council was "egregiously mistaken" in its decision to deny Plaintiff's request for review.  Mills, 244 F.3d at 5.  Plaintiff contends that the evidence contained in Dr. Rafal's letter is "clearly new."  Document No. 4 at p. 21.  This Court disagrees.  The record before the ALJ contains a more detailed report from Dr. Rafal dated August 26, 2005.  (Tr. 362-264).  In that report, Dr. Rafal notes that Plaintiff reported "a 15 year history of generalized muscle aches and pains"

including "occasional swelling in hands" and "occasional tingling in hands and feet." (Tr. 362).

After examination, he opined that Plaintiff "does meet criteria for a diagnosis of fibromyalgia." (Tr.

363). Dr. Rafal also observed that:

> [s]he does have an elevated sed rate and rheumatoid factor titer and
> is being evaluated by rheumatology for other rheumatic condition
> which I support. Nevertheless, she does have significant tender
> points and is quite limited secondary to pain. There is a significant
> history as well for depression and chronic insomnia which I feel can
> be further impacting her symptoms. I do believe that she would
> benefit from a comprehensive approach.

Id. In short, Dr. Rafal's March 2, 2006 letter is cumulative of his own prior diagnosis contained in

the record.

The administrative record contains varying opinions about a diagnosis of fibromyalgia. Dr.

Rafal diagnosed the condition. Dr. Grillo indicated a possibility (Tr. 293) or suggestion (Tr. 297)

of fibromyalgia but did not diagnose it. He did diagnose inflammatory osteoarthritis (hands, wrists,

shoulders). (Tr. 293). On August 23, 2004, Dr. Akhund was "not sure" what she could attribute

Plaintiff's pain to and "believe[d] it might be multifunctional, osteoarthritis/fibromyalgia." (Tr. 275).

Dr. Akhund did not mention fibromyalgia in her February 1, 2005 (Tr. 391) and May 3, 2005 (Tr.

392) reports but included it as a "medical/clinical finding" in a physical activity report submitted

for use at the ALJ hearing. (Tr. 396-399). However, Dr. Akhund's medical records never explain

when and what caused her to move from a possible to an apparent actual diagnosis of fibromyalgia.

Dr. DiMarco, Plaintiff's treating physician from May 2000 to May 2004, did not diagnose

fibromyalgia. (Ex. 4F).

Finally, Dr. Kaplan, the ME with a specialty in internal medicine and rheumatology (Tr. 65),

testified that Plaintiff did not "qualify under the accepted or generally referred to classification

criteria for fibromyalgia."  (Tr. 69).   The ME based his conclusion on Plaintiff's "elevated sedimentation rate" and hand pain "which is usually not a problem with fibromyalgia." (Tr. 69-70). The ME explained that fibromyalgia is a "diagnosis of exclusion," and that Plaintiff's "abnormal blood tests" precluded a fibromyalgia diagnosis because "if you look strictly according to the classification criteria you're not supposed to – everything else is supposed to be normal." (Tr. 82). He also observed that Plaintiff's hand problems were "not consistent with fibromyalgia." (Tr. 83).

Based on this record, Plaintiff has not established that the Appeals Council's failure to review the ALJ was "egregiously mistaken."  Plaintiff also has not established that the ALJ erred by failing to find her fibromyalgia to be a "severe" impairment at Step 2.  Faced with conflicting medical evidence, the ALJ relied upon the ME's testimony which questioned the fibromyalgia diagnosis based on "blood test results showing an elevated sed rate."  (Tr. 26, n.1).  "The ALJ's resolution of evidentiary conflicts must be upheld if supported by substantial evidence, even if contrary results might have been tenable also."  Benetti v. Barnhart, No. 05-2890, 2006 WL 2555972 (1st Cir. Sept. 9, 2006) (per curiam) (citing Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1 (1st Cir. 1987)).  Since the record contains competent evidence to support the ALJ's conclusion as to fibromyalgia, it is entitled to deference.

### B.      The ALJ's RFC Assessment is Supported by Substantial Evidence

The remainder of Plaintiff's arguments all take aim at the ALJ's RFC assessment.  Plaintiff argues that the ALJ did not properly evaluate Dr. Dizio's evaluation in assessing the non-exertional limitations of her depression.  She also argues that the ALJ failed to properly apply the treating physician rule to Dr. Akhund's opinions.  Finally, Plaintiff asserts generally that the ALJ's non-disability decision is not supported by the record.

The ALJ determined that Plaintiff could perform light work with certain other exertional limitations, and a moderate non-exertional limitation in concentration, persistence and pace, "such that she can understand, remember and carry out simple 1-2-3 step tasks over an 8 hour work day with appropriate breaks approximately every 2 hours." (Tr. 31, Finding 6). Based on a hypothetical incorporating this RFC (Tr. 86-87, 94), the VE testified that Plaintiff could not perform her past work as a programmer but could perform certain retail, clerk and light delivery positions present in significant numbers in the regional economy. (Tr. 30, 31 at Finding 12). If Plaintiff had been limited to sedentary work, a disability finding would have been dictated by the grids (Rule 201.14). If Plaintiff had a moderately severe limitation in concentration, a disability finding would have been dictated by the VE's testimony. (Tr. 87).

Plaintiff argues first that the ALJ violated the treating physician rule by preferring the opinions of reviewing DDS physicians (Drs. Georgy and Bernardo) over her treating physician (Dr. Akhund). In her decision, the ALJ provides a detailed explanation of the respective weights accorded to the various medical opinions offered regarding Plaintiff. (Tr. 28-29). Although Plaintiff disagrees with the ALJ's ultimate conclusions, she has not shown any error in the ALJ's evaluation of medical evidence. See Rivera-Torres v. Sec'y of Health and Human Servs., 837 F.2d 4, 5 (1st Cir. 1988) (the resolution of evidentiary conflicts is within the province of the ALJ).

Plaintiff alleges that in determining her RFC, the ALJ failed to give appropriate weight to the opinion of Dr. Akhund, one of her treating physicians. A treating physician is generally able to provide a detailed longitudinal picture of a patient's medical impairments, and an opinion from such a source is entitled to considerable weight if it is well supported by clinical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d). The

amount of weight to which such an opinion is entitled depends in part on the length of the treating relationship and the frequency of the examinations.  See 20 C.F.R. § 404.1527(d)(1).  If a treating source's opinion is not given controlling weight, the opinion must be evaluated using the enumerated factors and "good reasons" provided by the ALJ for the level of weight given.  20 C.F.R. § 404.1527(d)(2).

The ALJ provided adequate reasons for her refusal to fully credit Dr. Akhund's opinion and, since such reasons are supported by the record, they are entitled to deference.  It is also important to note that the ALJ rejected only one portion of Dr. Akhund's RFC opinion.  The ALJ correctly recognized that Dr. Akhund's opinion and those of the DDS physicians were basically consistent with one exception.  (Tr. 28).  The exception is that "the reports diverge with respect to [Plaintiff's] capabilities in the areas of lifting and carrying."  Id.  Dr. Akhund opined that Plaintiff was limited to lifting up to ten pounds (sedentary work – 20 C.F.R. § 404.1567(a)) (Tr. 396); while Drs. Georgy and Bernardo opined that Plaintiff could occasionally lift up to twenty pounds and frequently lift up to ten pounds (light work – 20 C.F.R. § 404.1567(b)) (Tr. 268, 339).  The ALJ resolved this conflict in favor of the DDS physicians and gave adequate supporting reasons:

> [the DDS opinions] are more consistent with the record as a whole, given Dr. Akhund's recent finding that [Plaintiff's] pain is well controlled with current medication and the test results indicating mild carpal tunnel syndrome on the right side only, no abnormality in the left wrist/hand and completely intact neurology.  (Ex. 3F, 9F, 23F).

(Tr. 28).

"[An ALJ] may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors."  Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002) (citing Shaw v. Sec'y of

Health and Human Servs., 25 F.3d 1037 (1st Cir. 1994)).  That is exactly what the ALJ did in this case, and there is no error.  Based on the totality of the record including substantial portions of Dr. Akhund's RFC opinion (Tr. 396-399), the ALJ reasonably limited Plaintiff from repetitive postural movements, repetitive overhead reaching or lifting and repetitive forceful gripping or grasping.  (Tr. 28).

Plaintiff has shown no error in the ALJ's physical RFC assessment and no violation of the treating physician rule.  In fact, Plaintiff's treating physicians prior to Dr. Akhund (Drs. DiMarco and Das) were not supportive of a disability finding.  For instance, Dr. DiMarco saw Plaintiff in February 2004, the month of her alleged disability onset, and opined, "She is not permanently disabled at present."  (Tr. 205).  (emphasis in original).  The following month, Dr. Das noted that Plaintiff "grossly exhibits very minimal effort during the examination" (Tr. 200), and in agreement with Dr. DiMarco, he opined, "I sincerely believe [Plaintiff] can go back to light duty and she is not a candidate for disability."  (Tr. 197).  In May 2004, Plaintiff again discussed with Dr. DiMarco her application for disability based in part on an inability to walk, yet Dr. DiMarco observed that Plaintiff walked down the hallway and into the examination room without difficulty and had a normal exam.  (Tr. 202).  Dr. DiMarco reiterated on May 19, 2004, "Both Dr. Das and I feel [Plaintiff] does not want to work but is capable of working."  Id.

Despite Plaintiff's indication that she needed a wheelchair and a handicapped parking placard (Tr. 54, 202, 299), Plaintiff's physicians did not agree with her on this point, and even Dr. Akhund opined that Plaintiff could stand and walk for six hours each.  (Tr. 396-397).  In fact, the record shows that she went on vacation without a wheelchair (Tr. 299), "did a lot of walking on a hilly golf course" (Tr. 309), and walked for leisure.  (Tr. 380).  Plaintiff alleged that her hand pain

and limitations were so severe that, at times, she could not even move the pieces on a board game. (Tr. 54-55).  However, even Dr. Akhund did not assess such restrictive hand limitations (Tr. 398), and Plaintiff was able to travel on vacation, prepare some light meals, do laundry with help, shop with help, drive (Tr. 53-54, 151-152), and care for her dogs (Tr. 380) despite her allegedly disabling hand pain.  Finally, the ALJ found that Plaintiff's "allegations regarding her limitations are not totally credible."  (Tr. 28, 30 at Finding 5).  The ALJ articulated supporting reasons for this finding, and thus Plaintiff has not challenged the ALJ's adverse credibility determination.  However, since Dr. Akhund's opinions are based, in significant part, on Plaintiff's reported systems, the ALJ's conclusion that Plaintiff is not "wholly credible in presenting a more limited self-assessment of functional capabilities" (Tr. 28) also negatively impacts on the weight accorded to those opinions.

As to non-exertional limitations, Plaintiff contends that the ALJ erred in her evaluation of the results of Dr. Dizio's consultative examination (Ex. 11F) and erred by not recognizing "an incremental increase in the degree of non-exertional limitations" by the combination of her depression and physical ailments.  Document No. 4 at p. 16.  These arguments are unsupported and merit little discussion.  Dr. Dizio diagnosed major depression in partial remission in response to medication and opined that Plaintiff would experience a moderate impairment in "her ability to carry out instructions and respond appropriately to customary work pressures." (Tr. 319).  Dr. Clifford, a DDS examiner, concurred with Dr. Dizio's diagnosis and found a moderate limitation as to maintaining concentration, persistence or pace.  (Tr. 330, 334).  Dr. Clifford opined that Plaintiff "should be limited to simple assignments of a few, quick and recurring steps."  (Tr. 336).

The ALJ reasonably incorporated these medical findings into her RFC assessment and found Plaintiff to be "limited in concentration, persistence and pace, such that she can understand,

remember and carry out simple 1-2-3 step tasks over an 8 hour work day with appropriate breaks approximately every 2 hours." (Tr. 31, Finding 6). Both Dr. Dizio (Tr. 316-317) and Dr. Clifford (Tr. 336) were aware of Plaintiff's physical ailments and pain complaints when they found Plaintiff to be only moderately impaired. Plaintiff cites no legal support or medical support in the record for her claim that her physical ailments would "incrementally increase" the level of her non-exertional limitations. In fact, she relies solely on a citation to "common sense." Document No. 4 at p. 16. On the other hand, since the ALJ based her mental RFC assessment on substantial medical evidence of record, it is entitled to deference. Plaintiff has shown no error.

##### VI.    CONCLUSION

For the reasons stated above, I recommend that the Commissioner's Motion for an Order Confirming the Decision of the Commissioner (Document No. 6) be GRANTED and that the Plaintiff's Motion to Reverse Without or, Alternatively, With a Remand for a Rehearing the Commissioner's Final Decision be DENIED. (Document No. 4).

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
May 17, 2007